We have four argued cases this morning. The first is number 14-1469, Medicines Company v. Hospira, Inc. Mr. Hawke. Good morning, Your Honors. Please accord Edgar Hawke for the Medicines Company. I would like to start by pointing out that we already had an oral argument on appellant's issues before and then on remand from the Ombong panel and the direction of this court, we were instructed not to be redundant to anything. So in our briefing, the briefing is the same on our appellate issues. We did respond to the cross-appellant on the on-sale bar issue, which is different in the briefing. But I just wanted to point that out and so I didn't want to be presumptuous and just re-argue what was argued or some of the issues that we addressed. You better re-argue anything you want us to think about because we don't remember. Okay. Thank you, Your Honor. What? Okay. Very good. On this appeal, the appellate issue really is a claim construction issue, right? The Medicines Company believes that the district court erred in the legal, in the claim construction of both the 727 patent, which is directed to a product only, and the 343 patent, which is directed to a product by process. Let me ask you about the 727 because what the district court, of course, said here is that efficient mixing has to be viewed as a claim limitation of the 727 patent. You say, no, that's not appropriate. I take it that your distinction from the prior art of the 727 is based on the notion that you get consistent batches as a result of following the patent and that that's what distinguishes it from the prior art. Is that fair? I think that's a fair characterization. I think it's consistent. I'm not quite sure what Your Honor might mean by consistent, but the claim says that the maximum Asp9 level, which is the impurity, is not above about 0.6. Well, that alone would not distinguish it from the prior art, correct? No, I don't think that is correct. Because there were certainly batches that were below 0.6 in the prior art. The question is consistency. Yes, Your Honor. Yes. But when Your Honor is saying prior art, there was no prior art other than what the medicines company was doing in the earlier versions of the angiomax. Well, sure. But that's prior art. Correct. So you were making batches under 0.6, so you can't say that 0.6 is a distinguishing feature, right? They were making some batches below 0.6. However, you have to go to the claim in the 727 patent. The claim says pharmaceutical batches, which is a specifically defined term in the patent. That's critical to this case. Well, that's why I asked you about the consistency. And it's either one single batch, which is representative of all batches. So, for example, in the ANDA, they have one batch. Okay, but just to be clear, the fact that the 0.6 limitation is not enough to distinguish the prior art, right? It would have to be all batches that are made. It would have to be. Correct. So that's the consistency limitation, right? Yes. All batches have to be below 0.6, about 0.6. Okay. So how under the Hospira-Glaxoferin line of cases is that a limitation in the ANDA? And I'm having difficulty seeing how the 727 patent is infringed, even under your theory of how it should be construed, by the filing of the ANDA. Okay. The filing of the ANDA here, there's a specification in that ANDA that embraces, covers the 0.6, up to 0.6. The spec actually goes beyond that. That's clear enough. To the extent that there's a 0.6 limitation in there, you're under Hospira. I mean, that's clear enough. I'm not talking about the 0.6 limitation. I'm talking about the consistency limitation. The consistency limitation, as you interpret it, is not part of the ANDA. Well, I would disagree. They have only one exhibit batch. They only made one batch, and they set forth how they made the batch. They have a compounding process that they use, and it resulted in an ASC-9 level well below 0.6. And I think they represent it to the FDA. That's not my question. My question is, where in the ANDA is the consistency limitation? It is in the ANDA where they are telling the FDA what their manufacturing process will be. And you have to assume, I think the FDA assumes, that they will use the manufacturing process they represent, they did use to make the exhibit batch, and that they will continue to use it. Sorry, you're going to have to bear with me. I had oral surgery. There's nothing in the ANDA that suggests that that process will always result in the 0.6 or below. It happens to be for the batch they produced to the FDA that it did. I thought the whole point of your patent is that the prior art methods resulted in bad batches sometimes. So I don't see anything in the ANDA itself that says our process will always result in a 0.6 or below. They don't use those words, of course. That would be irrelevant to the ANDA from that standpoint. But the process that COSPERA uses and that was at trial and there were fact findings by Judge Andrews that it was efficient mixing. And that's why, but for the other limitations that the court also put into efficient mixing. But you're saying that's not a claim limitation in the 727. Well, I think the district court thinks it is. The district court said that. The district court did, but the questions are directed to where we go under your theory of how the 727 should be construed. COSPERA uses, first of all, COSPERA made one batch and it is representative of all batches. Therefore, they satisfy the claim limitation for a pharmaceutical batch. The Asp9 level is below 0.6. They satisfy that. It was adjusted by a base. The pH was adjusted by a base. They satisfy that limitation. And they also measure the Asp9 level by HPLC. So they measure, they meet all the limitations of Claim 1. Tell me where COSPERA's mixing doesn't share the characteristics of Example 4. As was found by the court, they did not have rapid mixing. In other words, in Example 4, they rapidly mixed. They added the pH adjusting solution rapidly. COSPERA did not do that. And, in fact, the court made fact findings saying that's how he distinguished, how the court distinguished what they were doing from Inefficient mixing. Well, actually, let me rephrase that. COSPERA didn't follow Example 4 exactly. But it did follow Example 4 so far as the court found it to be inefficient mixing, right? Inefficient mixing because they did certain of the steps too quickly. That's basically what the court found. And therefore made those fact findings. And because there was a limitation in the claim requiring efficient mixing, the court found no infringement. And our position here is there should not have been that requirement in Claim 1 of the 727 requiring efficient mixing. That's Example 5. It's an embodiment. But, in addition, the court went further and said what efficient mixing had to be and took out part of Example 5. Took out the high shear mixing, for example, and slow and controlled addition, which is in Example 5. That's an embodiment of what efficient mixing is. It's not, according to this invention, the only way you can efficiently mix. In any event, the court below found that what COSPERA did was close enough to Example 4 that it was inefficient and, therefore, not infringing. And, hence, the appeal here in that one, we think it was legal error to put that limitation into the Claim 1 of the 727. It was also legal error to put into Claim 1 of the 343 patent, which does use the phrase efficiently mixing, and to make that even narrower by putting in high shear mixing and an RPM above 1,000. What do you think the construction of efficient mixing ought to be? Minimizing impurities? Yes, in addition to... Why wouldn't that be indefinite? Because I think a person who earned his skill in the art on the Nautilus case and other cases would clearly see the scope of the claim here. As I just went through... Do you want to apply the New Jersey courts? Well, the New Jersey court did not incorporate that limitation. Neither did the Chicago court, Judge St. Eve, which you're going to hear about in a little while. That judge didn't put in that limitation into the 727 patent either and did find infringement. But that's the next appeal. Let me just say this. I'm going to say this to both of you. But when I read Hesperia's red brief, they say because a Pazita couldn't determine with reasonable certainty on an ongoing commercial basis the 0.6 ASP, the claims are indefinite. My immediate marginal note on that was that it was like Schrodinger's cat and that we were shifting over into quantum physics. But as soon as it happened, you knew what it was. And I just found that problematic, and I want you to discuss it a little bit. Certainly. I think maybe there's some confusion here. As I understand the Hesperia argument, they're saying because we can't really determine if we're infringing or not, it's indefinite. And that's not the legal test. Until it comes out. Until it comes out. Until it comes out, right. And so you will know then, and I don't think a person with a skill in the art has any problem with definiteness in determining the scope of this claim. You know what all those claim limitations are. If the alleged infringer is making batches, if they make one batch like Hesperia did, and that batch is representative of all batches, which they say to the FDA it is, that's all you have to look at. And that's what we did look at. I guess what they're saying is that they can't tell whether batch 16 infringed until they produce batch 31, if batch 31 is outside of the parameters. Well, there's nothing in the claim that requires more than 16 batches or any number of batches. It's either one batch that's representative or all batches that are made by the same compounding process. So under my hypothetical, 31 batches are made by the compounding process. And when you make batch 16, you can't tell whether there's infringement until you know what happens with batches 17 to 31, right? If you make 16 batches and then you look at all those 16, you can tell if you infringed. If you now make a 17th batch, you have to look at 17. How can you tell if you infringed without knowing about batches 17 to 31? Well, I don't know why you would have to make batch 17 or 31. In other words, that's a hypothetical. The hypothetical is you're making 31 batches. And you can't tell about batch 16 until you've made the rest of the batches and know that all the batches were within spec. I think a person with a skill in their reading this patent would understand that if you're using the same compounding process to make batch after batch after batch, and you're using efficient mixing the way the patent teaches it, the person with a skill in their eyes is going to say you infringed. And if they somehow make those batches and they get to batch 31 and it's outside the claim, well, maybe it doesn't infringe at that point. But I think that's a fact question. You'd have to look at what they did, how did they do it. It's more a question of whether they botched the process. It could be. It could be. It would be a fact question. Absolutely a fact question. So in the hypothetical, I can't tell. But isn't it true that the prior method resulted in okay purity levels most of the time, and only some of the time resulted in impurity levels above the desirable amount? That is true. So they could very well be using the old method, and the first batch they produced was okay. I mean, if they're using the old method, they don't infringe a patent, do they? That's correct. They could follow example four, for example. How do we know just because one batch might have been an acceptable level? Well, I think you're making an assumption, Your Honor, that if they're using the same compounding process in the same way, that they're going to get variable results above and below 0.6. Isn't that what happened in the prior art? Yes, it did. And that's why. So how do we know theirs doesn't operate in a similar way? Because when it happened in the prior art, which is example four, what was recognized by the inventors is that was the whole problem that they had to solve. What was going on here? What's wrong with what we're doing here with these 89 batches? And they figured out what was wrong with it. It was the process and the overall whatever, and they wanted to lower the impurities, and they changed the process. But isn't the case that in order to know whether they infringe 727, it has to include some notion of what the process is, not just the purity level? Not to determine infringement of claim one of the 727. I think all you have to do there is go through the claim, as we always do, and look for every single claim. I don't understand that at all, because it seems to me that if you produce something under the prior art, in your view, if you produce something under the prior art that resulted in something below this purity level, it would violate your patent, and that can't be the case. I have not taken that position. We do not take that position. Well, you're not putting any limitations in it that would exclude the prior art producing below the purity level. But you are. Yes, we are. We at least have to understand what the process isn't. It isn't Example 4, for example. Correct. That's right. It's not Example 4. Example 4 is clearly an example of the prior art, as you're referring to it, Your Honor, which was the prior batches they were making, and that's the actual data. That's the actual data that they had, so they put it in the patent as they should, and then they conceived and they came up with their invention with the new compounding process, if you will, efficiently mixing, and that is what's exemplified in Example 5. But that doesn't mean the claim has to be limited to what they did in Claim 5. If someone today follows Example 4, they don't infringe, clearly not. They don't infringe which patent? They don't infringe the 727? Well, I don't think they would infringe either one because the 343 has a limitation in it for efficiently mixing. While I don't think it has all those other subservient, narrower limitations, it does say efficiently mixing. So if they're not efficiently mixing, meaning they're following Example 4, then they're outside the patent. They're outside the 727, too? Well, no, that would depend. It would depend on the facts there and what they're doing. If, for example, they meet all the other limitations in Claim 1, then they would be infringing. In other words... Because it doesn't mention efficiently mixing. Correct. And inefficient mixing is not a defined term in the patent. It's a described term in the patent, but it's not defined. And so when Your Honor says... That's your problem. Well, I don't think it's a problem. I don't think it has to be. It's described. It's amply described. Efficient mixing is described from, I think it's column 8, line 50 or so, for about the next three or four columns. There's a lot of disclosure about examples of what efficiently mixing is. Yeah, but those don't provide any standard. Aren't the district courts here right? Do you have to look to the examples to figure out what efficient mixing is? No. You should look at the example for sure, but you don't have to. There are five examples that go through very laboriously all the testing they did and the analysis they did, and they changed different parameters. They changed slow conditions, whether you mix quickly, slowly, whatever it is. There are a lot of different parameters I'm using up my time. So I come back to the limitation for efficiently mixing should not be in claim one. All right. Well, I think that's enough for the moment. We'll restore your rebuttal time. Thank you. Mr. Leary. Thank you, Your Honor. May it please the Court. Why don't you start with Schrodinger's cat for me? Oh, it's a good place to start. Well, I think Your Honor has captured the essence of our argument. Namely, one of ordinary skill can't tell by making, after he's made one batch or even two batches or three batches, one of ordinary skill cannot tell if he's infringing or not infringing. He has to make the complete set of batches. It has to be a closed set, and then he examines the outcomes in this entire set, and if he finds or she finds that the maximum has been met by the entire set of batches made using the process, then you can make a determination. But that is an indefinite limitation in its very essence, because the essence of definiteness is to be able to know if you're infringing in real time, as opposed to finding out a year and a half from now, oh, I never was infringing because now I've exceeded the maximum. Supposing we think you're efficiently mixing, and supposing your results always come out below six, but you say they might not. Your expert says they might not come out below six. What are we to do with that? Well, our expert did say, one of our experts did say they might exceed 0.6. There's no way to know until you've completed the set. Well, I think the outcome is that the 727 claims, well, in fact, this would apply to both, because the maximum limitation is in both patents. I think the outcome is that the patents are indefinite, and that's the argument we have consistently, and we made that in the district court. Judge Andrews did not agree with us. We made that when we argued to this panel originally, and I think that's the necessary outcome because of the very unusual nature of the claims. Now, it was complicated by the fact that the district court found that efficient mixing is part of 727. I think it's helpful to understand how that happened. But would that eliminate the indefiniteness question that you raised? Well, I don't think it would. I think it kind of confuses the analysis because it shifts the focus to efficient mixing. And, of course, Judge Andrews found that Hospiro does not efficiently mix. If you look at what Hospiro does, it really is an example of Example 4. There was no high-sheer mixing. There was no slow. It really is an example of Example 4? It is, yes. So the batch made by Hospiro would be included in Example 4, not in Example 5. Therefore, it would be an example of an inefficiently mixed batch, not an example of an efficiently mixed batch, and, therefore, it would not infringe. And I think that was Judge Andrews' analysis. But let me return to the point about how did efficiently mixing get into Claim 1 of the 727. That wasn't Judge Andrews. That happened during prosecution. Claim 1 of the 727 patent, as originally written, as originally drafted, did not include the wherein the pH is adjusted by a base limitation. That was added at the insistence of the examiner during prosecution. Medco responded to that by putting in inventor affidavits. In the inventor affidavits, the inventors talked a lot about the process, how the process changed, and, therefore, the invention is different from the new batches or different from the old batches. And the examiner said, ah-ha, I understand that. But 727, Claim 1, doesn't refer to the process. You have to put something in the claim that refers to the process because it's the process that distinguishes the new batches from the old batches. So the language that was agreed upon was the wherein clause. And that's why Judge Andrews was right to read that clause as distinguishing, as being, that's the language, at least in the mind of the examiner, as agreed with by Judge Andrews. That's the language that distinguishes new batches from old batches. And so what does that mean? So we look, we go to the specifications, try to understand what this wherein clause means. And what we find in the specification is that the old batches are disclaimed. To put that in Phillips, post-Phillips language. There's a disclaimer. There's a clear disclaimer. The inventors say a couple of different times that the old batches are not our invention, but the new batches are. So there's a disclaimer. And so when you look at the specification, what you find, and unavoidably find, is that the wherein clause must mean that whatever the process is, it can't be the old process. It can't be inefficient mixing. And so I think Judge Andrews was absolutely right, given the prosecution history, was absolutely right to read the claim the way he did and to include efficient mixing in his construction of the claim. But there are other clues, too. It's not just this disclaimer. I mean, that alone is enough. But if you take out the wherein clause, if you remove that from Claim 1 of the 727-PET, what you wind up with is essentially a functional claim. It's an aspirational claim. We claim any way of making batches where the maximum is never exceeded. But we're not going to tell you how to do that. You're going to have to go invent that yourself. We've shown you one way, but we're claiming all the ways that you can avoid exceeding the maximum. A functional-type claim, which I think there's a consensus now those are not good claims. You don't really mean that. You don't mean all ways. You mean all ways using efficient mixing. Well, if efficient mixing is in the claim, I'm saying imagine their claim construction has been adopted. Then, anyway, avoiding the maximum would be something that they would say would fall within the scope of their claim, even though they don't disclose these other ways of achieving that. That's the problem with the way that that claim was drafted. Before, the examiner required that the wherein language be added to the claim. That would be our argument. That's why I think the trial judge was right. But there's more. The pharmaceutical batches limitation requires efficient mixing. If you look at the definition of pharmaceutical batches in column five, you'll see that pharmaceutical batches are only those batches made using an embodiment of the invention. The language is right. It's lexicography by the inventors. If you don't use an embodiment of the invention, you're not making pharmaceutical batches per this lexicography. Well, what's an embodiment of the invention? All of the embodiments of the invention are in efficient mixing. That's another way that you reach the same outcome that Judge Andrews reached. Finally, the inventor testimony. For whatever weight that deserves in claim construction, Mr. Musso, Dr. Musso testified. This is on page 16 of our red brief. The efficient mixing is always required by the 727 patent. Always. So everything lines up with what Judge Andrews did. And I would urge the court to use his construction and affirm his construction, which leads, I think, inevitably to the outcome that his high spirit does not infringe. Suppose you're right about that, hypothetically. Suppose you're right that Judge Andrews was correct and that you don't infringe. Does that resolve the case? You have these counterclaims of invalidity. Does the court have to reach those if it finds non-infringement? What's your position on that? Well, my position is if this court agrees that there's no infringement, my client would be thrilled. But I think the court does have an obligation to address the rest of the arguments. And so I'm prepared to talk about on sale bar or answer any other questions the court might have. But my thought was with the time that I have, I would speak about on sale bar where I carry the burden. But I don't want to move too quickly if the court has more questions about these issues relating to the claim construction. Well, on the on sale bar question, what about the footnote in Judge Andrews' opinion? I don't admit to footnote 15. I'm not sure. In which he says, I'm not going to reach the question of whether this requirements contract or whatever it is covered the old product or the new product. Well, I think it's clear. Shifting away from the argument that we had before the end bank court where we were talking about the validation batches and the focus was on the validation batches, shifting to what was the subject of the distribution agreement, it's clear that what was being offered for sale in the distribution agreement was all of the angiomax, not the three validation batches, but all of the angiomax that ICS could buy over the next three years to be resold in the United States. How do we know that that's the new product as opposed to the old product? Because that's all that there was at that point, Your Honor. After October 25th, they never used the old. Was there anything in the agreement that specifies what the product is in terms of old versus new? Well, no, because they're identical. The batches are identical and the label did not change. So the old batches and the new batches are indistinguishable from the standpoint of the marketplace. But what we do know is that there were 11 batches at least that were embodiments of the invention that were offered for sale as part of the agreement with ICS. Because it was going to be all of the angiomax for the next three years, certainly not limited in any way to the old angiomax. That would have been completely counterintuitive. Whatever was the current commercial product, that's what was being offered. And as of February when this agreement was made. Does the agreement say that? No, but that would be the natural reading of any commercial contract. Well, I guess so, yeah. But there's a contract construction issue here which wasn't resolved by Judge Andrews, correct? Well, I think that's right. And I will say I am not 100% clear on whether contract construction constitutes a fact finding or a legal finding, but it's an interpretation of a legal document. So I think it's something that this Court is capable of doing de novo. I wouldn't think you'd have to send it back for him just on that particular point. And I would urge this Court that the normal, natural reading of the contract is whatever the commercial, current commercial product is, that's what's being offered for sale. And as of February of 2007, when the agreement became effective, the current commercial product in the pipeline were the new batches. And, in fact, the old batches, the old way of making batches was never used again by stipulation of the parties in the trial after October 25th of 2006. They knew it worked, and they changed their process. And they documented the change, and they began making the new batches. And so the argument about... This is before the contract was signed. This is before the contract was signed. The three validation batches were made in October, November, and December of 2006. The contract, I don't know when it was signed. I know that it recites that it became effective in February of 2008. So those batches were made before the contract was signed. The next eight batches, I'm unclear when they were made. The record doesn't reflect, is what I should say. The record doesn't reflect exactly when they were made. But they were made clearly before the critical date. So they were made during the spring, and they were part of what was offered for sale. And the fact that they didn't sell them, they didn't actually deliver the batches using the new process until after the critical date is of no moment. That's exactly what happened in Phillips. In Phillips, the offer was made, and the chip connectors, whatever they were, the connectors that were the object of the invention in the Phillips case, they weren't delivered until many months after the critical date had lapsed. So the fact that they were not actually sold and delivered until after the critical date doesn't mean they weren't a subject of the contract or the offer for sale. Let me speak about a couple of other arguments that Medco raises in connection with this. They say it doesn't qualify as a commercial offer because it's not like the Group 1 case, where a simple acceptance would form an enforceable contract. But that's just not right. What happens under this ICS agreement, which has all of the elaborate terminology that one would expect of a uniform commercial code, Article 2 contract for sale, everything is in this agreement. And one of the things is that when a purchase order is submitted, it automatically becomes effective if it's not rejected in 48 hours. Recall there's this little term in the ICS about being able to reject purchase orders. This is not an unusual thing. The contract doesn't say this, but when it's in a contract, it's usually for supply chain reasons. If you send me a purchase order, I have this obligation to honor it, use my best efforts to honor it in 48 hours, which this agreement requires. I have this obligation. Well, if I don't have any by Valrhoon, and it's coming from Italy, or I think they may have sourced it from Italy at that time. If it's coming from Italy, I can't get it in 48 hours. I'm not going to be able to honor this purchase order. So this one I'm going to have to not honor. But clearly the sense of this agreement is that purchase orders are going to be honored. It would be nonsensical for the medicines company not to honor these purchase orders, because this is the only way they can sell angiomects during this three-year period in the United States. This is an exclusive arrangement. They can't sell to anybody else for resale in the United States, so they're going to honor the purchase orders. It's 90% of their revenue back in that time period. There was never any idea that they would dishonor purchase orders except when they needed to, and the contract limits their ability to dishonor a purchase order when it's commercially reasonable, or maybe the language is commercially necessary. But the concept is if I can't, probably because of supply chain reasons, I'm going to honor these purchase orders. So it is like Group 1. It's just like Group 1. It automatically becomes enforceable if the purchase order arrives and it's not dishonored under this specific language within 48 hours. Okay. Well, I think your time has expired. We'll restore your rebuttal time. Thank you. A few comments further. Judge Andrews made fact findings that Hospira, number one, did have a pharmaceutical batch as required by Claim 1 of the 727, because they had a representative batch. Judge Andrews had no problem with definiteness in determining how to find whether or not they met that limitation. He also found that Hospira had, as I said, an S9 level below .6. What he also found was they didn't efficiently mix, which was the limitation he was reading into the claim. And he found that they followed Example 4 more closely and they added it too fast. And, therefore, it wasn't efficiently mixing, as Judge Andrews was construing the term, and that's what we think the legal error was. But he had no problem with definiteness or indefiniteness, I should say. Hospira never challenged what a pharmaceutical batch is. That was not a claim construction term that was being challenged at any time in this case. I heard something today from Mr. Oyerler about it should require efficient mixing. That was never argued, to my knowledge or my recollection, and I don't think that's an issue. I'd like to move to the on-sale with the ICS agreement. As to the on-sale, do you agree that a requirements contract is an offer for sale? It could be, like in the Enzo case that was found by this court. However, in this case, the distribution agreement was found by Judge Andrews not to be a requirements contract. And, as a matter of law, I think reading... Why isn't it a requirements contract? Because there was no obligation on the part of the medicines company to supply the requirements of ICS, period. There's nothing in this agreement that says they have to do that. What it says in the agreement is ICS is a distributor, exclusive distributor, for sure, and they were being paid for that. And then they could issue a purchase order, and the medicines company had two days. It's paragraph 3.1 in the agreement. They had two days to reject the purchase order. Until they do that... But there's a best efforts obligation, isn't there? The best efforts is trumped, Your Honor. I didn't mean to speak... It's trumped. I think this best efforts is superseded by the language of the contract itself. The contract tells you how you can purchase product. It says ICS has to issue a purchase order in 3.1. But doesn't that just mean that the contract doesn't constitute a sale? But it's still an offer to sell. You just don't have to follow through on every single one. I think to have an offer to sell, you have to make an offer that can be accepted as is. It's a simple offer that can be consummated with a simple acceptance. Can I ask you the factual question that we asked your friend? Let's just assume we disagree with you and find this distribution agreement could legally constitute an offer for sale. Do we still need to send it back to the district court for fact-finding on whether this distribution agreement covered the old products or the new products? Or is it true that this is contemplating product produced under the new method? The answer is yes. You would have to send it back because that was not a fact-finding by the court, as is explicitly set forth in his opinion. But is there any real dispute there? Yes. At the time of this contract, which was February 27, 2007 is when it was executed, they hadn't even come up with the invention yet. They hadn't even made the invention yet. So they didn't have improved angiomatics, as it's being called. And, in fact, I think the first batch... You hadn't produced any batches? They had produced batches, but they had produced less than 25 batches, and they didn't realize they had an invention until after they made 25 batches. And that didn't happen until the middle of 2007, well after the critical date and well after this contract was entered into. In other words, Your Honor, until the medicines company, until the inventors made 25 batches and looked at the compounding process and the fact that it maintained or resulted in an S9 level consistently below 0.6, they didn't know they had made that invention. They didn't have appreciation. And this is the issue we have appealed also, which is ready for patenting. Judge Andrews found that in February or before February of 2007, the invention was ready for patenting, which is another element that has to be satisfied to find an on-sale bar here. And we challenged that also because it couldn't possibly be ready for patenting. They didn't even know they hadn't made an invention yet. And what Judge Andrews was looking at for that is he relied on the master batch record which set forth the process. And because Judge Andrews was thinking the invention is only the process, that's an enabling disclosure and therefore a reduction to practice and therefore ready for patenting. If the claim construction falls, clearly that can't be the case. And even, as I said, the conception here by the inventors was not until much later, after they made 25 batches. So it can't be ready for patenting. You couldn't even write a patent application. How would you satisfy 112 at that time? You don't know what the boundaries are of your invention before you know what it is. And so in February of 2007, when this distribution agreement was entered into... You wouldn't know that you had the invention until you produced the last batch. 25. It sounds similar to the indefiniteness problem we were talking about earlier for the infringer. Well... Was there an articulated hypothesis using the scientific method? Not really. I mean, I think there was a master batch record and there was some internal analyses that the inventors were doing, but I don't think... The maximum level would be 0.6. It definitely didn't exist. And again, it was 25 batches, because that's when they looked at it and they conceived of what they had done, and then they reduced it to practice by filing a patent application shortly thereafter. But it wasn't back in 2007. And as I said, Judge Andrews found that it was ready for patenting to satisfy the first part of the FAF test, but I think he did so erroneously because he was just looking at the process. Before you sit down, I just want to bring you back to the distribution agreement. Sure. And Section 4.2, which says that medicines will use its commercially reasonable efforts to fill the orders. Why isn't that a requirements contract? Well, it's commercially reasonable efforts to fill orders. The order has to be made first. There's no order. This contract doesn't specify... It's true of every requirements contract, that it contemplates future orders, saying here's how much we want, and that the contracting party has to use reasonable efforts to fill the orders. Why isn't that just a standard requirements contract? I think in a standard requirements contract, there's some kind of provision that says, you're going to supply us with up to 70% of our requirements. That's a contractual obligation that the other party has to satisfy that demand when it's made. If they don't, they have a contractual problem. Here, ICS, they could say, you know, we're intending to sell tons of stuff, but there's no legal obligation on the part of the medicines company to supply it. There's a legal obligation to use reasonable efforts, isn't there? To satisfy orders which are made and accepted. The order has to be accepted by the medicines company. It's in 3.1. They can reject it for any reason. Whoa. So they can unreasonably reject. I don't know what unreasonable... What if the medicines company decided that this market is not worth making the product anymore, it costs a lot of money to make the product, and they say the market is done because of generic competition or because of some other reason, whatever it may be, and they say, we're out of this business. It doesn't make sense for us to make this product anymore. So reasonable efforts is meaningless because they can reject it for any reason. I think we're talking about two different things. You were referring to paragraph 4.1, I think. But you said... I think I understood you to say that reasonable efforts only applies once they've accepted the order and that there's no obligation to fill the order unless they accept it and no obligation to use reasonable efforts unless they accept the order and then they can reject the order for any reason they want it. I think they don't have an obligation to use reasonable commercial efforts to satisfy an order until they get the order and accept it, yes. I'm not saying they can be unreasonable in anything. I'm saying that they don't have an offer of sale here of a specific product by virtue of the existence of this distribution agreement. Okay. Thank you, Mr. Hogg. Thank you. Mr. O'Leary, you've got five minutes of rebuttal time if you need it. Thank you. Let me pick up right where Mr. Hogg left off. So the contract does require ICS to place orders. In fact, the contract specifies that ICS is obligated to maintain inventory at levels that are commensurate with historical levels. They knew they had been doing business together for a long time. Before this distribution agreement, ICS was merely a distributor. After the distribution agreement, ICS became effectively a distributor outside the U.S. but a reseller within the U.S. So it began buying Angiomaxx and owning the Angiomaxx, taking title to the Angiomaxx and reselling the Angiomaxx. The distribution agreement required ICS to order at specific levels. It required them to submit purchase orders on Mondays or if that was a business holiday. Give me an appendix reference for that. I think the correct reference is paragraph 3.1 in the distribution agreement. And to effectuate that, ICS was required to submit orders. That's in paragraph 3.12. So of course there were going to be orders and of course they were going to be satisfied. Because there was a requirement for a specific quantity to be purchased by ICS, in fact the way it's phrased I think in the agreement is that ICS shall main inventory commensurate, but that implies orders up to a certain level over the three-year period of the agreement. And it requires obviously the submission of purchase orders in order to maintain that level. The agreement also imposes on the medicines company a commercially reasonable obligation to fill those orders. And the exception where a purchase order is for some reason not accepted isn't dealt with any long discussion in the agreement because it's not something that's contemplated as going to happen very often. Why in the world would they reject purchase orders unless they absolutely had to when rejecting a purchase order meant that they weren't making any sales in their biggest and best territory, namely the United States of America and some other, I think perhaps Puerto Rico was also included in the definition of territory. Why would they reject those purchase orders? Because the agreement also forbade the medicines company from selling Angiomax to anybody else who might resell it into that area. So it was an exclusive dealing arrangement. It was a sales agreement to supply a reseller for exclusive resale in the most important territory for three years. So these were serious obligations. It's a very sophisticated document that no doubt was negotiated by sophisticated people. They knew what they were doing. And the idea that they would just willy-nilly not sell to the only person they could contractually sell to, the only entity they could contractually sell to, seems to me to be sort of fantastic. And so I don't think that's a serious counter-argument. Now, I'd also like to speak for a moment about this idea that they didn't have the invention. So this is just an incorrect recitation of the law. It has never been the case that an inventor must appreciate all of the inherent qualities of his or her invention in order for it to be ready for patenting on sale purposes. And we can see why. Because there would be no end to new patents on old things if that were the case. Because we are forever figuring out new things about something we've been doing for a long time. So what they did know is this. They knew in October of 2006, they knew that they had a better method for mixing. And they never used the old method again. They knew that. And they could have written patent claims on that right then. It would have been a product by process claim. If you use the sufficient mixing, we claim that. And we claim the batches that are the result of that. We don't know what the maximum will be at that point in time. But we still can write a claim. And, therefore, it's on sale. The batches were on sale from that moment forward as they went into the product pipeline. And this idea that we need to appreciate all of the inherent limitations has just never been the law. But they might not have known that all the batches would come under the 0.6. But that doesn't matter, Your Honor. That doesn't matter. There are things we don't know about. Well, why doesn't it? Because that's part of the claims and the limitations, at least as you're incurring them. Why don't they have to at least appreciate that when they're making an offer to sell the product produced by this process? Well, I would suggest the court should look at ScalTech and the Abbot Geneva case and the Cargill case. I mean, this question comes up all the time. We've invented something new. We know it works. We know it reduces variability. We know it reduces variability. It's better than the old way of doing it. But we don't know for sure everything there is to know about it. We might figure out some things years from now. But in the meantime, it's been on sale. And those sales count as prior art. And they invalidate if that happens more than a year before the patent application is filed. It's happened here. And this court has dealt with that question many, many, many times because it's not uncommon. But the ScalTech case, the Cargill case, the Abbot versus Geneva case all deal with this. And there's no requirement that the inventors have to appreciate all of the inherent properties and benefits of their invention if they're selling it. Because if that were true, Coca-Cola could go get a patent on the Coca-Cola formula today. And that's not permitted. That's not permitted. Do we have to construe the claims of these patents as requiring batch consistency into the future? Well, certainly one of ordinary skill would understand that the real invention here is the reduction of variability. I would say that the real invention here is efficient mixing. Well, so they chose to disclose it as efficient mixing. But when we see the discussion, the comparison between the batches of example four and the batches of example five, the discussion is really about the reduction of variability. Then they say, now our way of reducing variability is to use efficient mixing. That's what they tell one of ordinary skill. Our way of reducing variability is efficient mixing. Somebody else might find another way, another new way of reducing variability. But our invention at the end of the day is efficient mixing. And that's the message that comes through. And that's what the patent examiner found. That's what he was worried about or she was worried about when, I think it's a she, required that the language referring to the process be put back in claim one of the 727 patent in order to distinguish it over the old batches. I know I'm not supposed to be talking about claim construction under a bottle, but that's my response to your question. And if there are no other questions, I'll rely on our briefs for the rest of our argument. Thank you, Mr. Laird. Thank you both counsel. The case is submitted. And that leads us to